UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION

DONALD E. STAHL,                    )
                                    )
                Plaintiff,          )
                                    )
        v.                          )       No.  4:09CV712 FRB
                                    )
CITY OF ST. LOUIS, MISSOURI,        )
                                    )
                Defendant.          )

### MEMORANDUM AND ORDER

This cause is before the Court on the parties' cross-motions for summary judgment (Doc. Nos. 18, 21). All matters are pending before the undersigned United States Magistrate Judge, with consent of the parties, pursuant to 28 U.S.C. § 636(c).

In this one-count Complaint, plaintiff Donald E. Stahl[1] seeks a judgment declaring that § 17.16.270 of the St. Louis City Revised Code, known as the "demonstrating ordinance," is unconstitutional, arguing that it violates the free speech provisions of the First Amendment of the United States Constitution, made applicable to the States by the Fourteenth Amendment. Plaintiff also seeks to enjoin the defendant City of St. Louis, Missouri ("the City"), from enforcing § 17.16.270. Plaintiff brings no claim seeking personal relief for any alleged violation of his First Amendment free speech rights or any other rights. This Court has subject matter jurisdiction over the cause pursuant to 28 U.S.C. §§

--------

[1]The Complaint also names William Demsar as a plaintiff to the cause. On April 12, 2010, Mr. Demsar's claim was dismissed without prejudice upon stipulation by the parties. (Doc. Nos. 16, 17.)

1331, 1343.

## I.  Background

The relevant facts of this matter are not in dispute. Plaintiff Donald E. Stahl is an organizer and member of the "911 Questions Group" in St. Louis, Missouri.  The group is an organization that believes that the explanations publicly offered regarding the devastation resulting from the events of September 11, 2001, can be refuted by photographic evidence, and that such evidence is being kept from public view.  The group desires for its message to reach the largest possible audience in the St. Louis area, and it communicates its message by displaying signs and distributing leaflets, televising public service announcements on a local public access cable channel, and through the internet.

On Friday, February 6, 2009, in an effort to communicate the group's message to a large audience, plaintiff Stahl and two other members of the 911 Questions Group went to the Park Avenue pedestrian overpass located over and near the merger of Interstate 55 and Interstate 44 in the City of St. Louis, Missouri, at approximately 6:00 a.m. during the morning rush hour.  Plaintiff had previously participated in several demonstrations on this pedestrian overpass during evening rush hour.  While on the overpass on February 6, plaintiff and one of his companions, William Demsar, held a sign approximately three-feet by four-feet in size, on which was written: "911 was an inside job."  At a time after 7:00 a.m. on that date, Officer Fred B. Cox, a patrolman with the St. Louis Metropolitan

Police Department, received a radio transmission to assist on an assignment at the pedestrian overpass based on a report that subjects standing on the overpass were holding a sign.[2] Officer Cox was the first police officer to arrive at the scene, and he observed plaintiff and Mr. Demsar holding the sign on the overpass. Officer Cox did not observe any disruption of traffic in the area. Officer Cox observed the traffic on the interstate to consist of a moderate amount of cars and trucks and to be moving at a safe pace. Officer Cox did not observe pedestrian and/or vehicular traffic to be blocked by plaintiff, Mr. Demsar, or their activity.

Officer Cox approached the gentlemen on the overpass and asked them to leave because they were disrupting traffic on Interstate 55. Both plaintiff and Mr. Demsar refused to leave, and Mr. Demsar became belligerent with Officer Cox. Plaintiff and Mr. Demsar were then placed in handcuffs and were removed from the overpass. Sergeant Matthew Rodden subsequently arrived at the scene and instructed Officer Cox to book plaintiff and Mr. Demsar for demonstrating, and to seize the sign.[3]

Plaintiff and Mr. Demsar were thereafter transported to the police station upon which summonses were issued for violation of §

---

[2]The police incident report subsequently prepared stated that a call had been received regarding persons on the overpass having an offensive sign which read "911 was an inside job," causing a disruption in the flow of traffic and causing safety issues.

[3]At his deposition, plaintiff testified that he overheard Sergeant Rodden tell Officer Cox that the sign looked offensive to him. At his deposition, Officer Cox testified that he did not recall any officers making such a statement.

17.16.270 of the Revised Code of the City of St. Louis, known as the "demonstrating ordinance."  The gentlemen were released later that same day.  The demonstrating ordinance, enacted in 1979, provides:

### 17.16.270    **Demonstration on or near street.**

No person shall sell or offer for sale any goods or merchandise, display any sign or pictures, participate in or conduct an exhibition or demonstration, talk, sing or play music on any street or abutting premises, or alley in consequences of which there is such a gathering of persons or stopping of vehicles as to impede either pedestrians or vehicular traffic.

When plaintiff later appeared at the Municipal Court to answer the summons, he was informed that the charge had been dismissed.  The charge against Mr. Demsar had likewise been dismissed.  The sign was never returned to plaintiff.

From his familiarity with the area through his experience as a police officer, Officer Cox believes that the relevant portion of Interstates 44 and 55 is particularly hazardous given the location of the 7th Street exit and the interchanging nature of the roadway. At the time of the conduct at issue in this cause, Officer Cox believed that plaintiff's action in holding the sign on the overpass at that location could have created a hazard inasmuch as drivers would be looking up at the sign.

At no time prior to February 6, 2009, did plaintiff experience any resistance from law enforcement officials regarding his demonstrating activities within the boundaries of the City of St.

- 4 -

Louis, including his previous demonstrating activities on the Park
Avenue overpass.  Since February 6, 2009, neither plaintiff nor other
members of the 911 Questions Group have participated in
demonstrations within the City for fear of arrest.

## II.  Discussion

In this one-count Complaint, plaintiff seeks only a
declaration that § 17.16.270 of the City Code violates the free
speech provisions of the First Amendment, and requests that the City
be enjoined from enforcing its terms.  Notably, plaintiff does not
seek personal relief for any alleged violation of his own First
Amendment right to free speech.  Nor does plaintiff bring any equal
protection claims of selective treatment; Fourth Amendment claims of
unreasonable seizure; or supplemental state law claims of false
arrest, malicious prosecution, conversion, or other claims stemming
from his arrest and the seizure of his sign on February 6, 2009.
Despite his lack of personal claims or the lack of personal relief
sought, plaintiff nevertheless has standing to seek the declaratory
and injunctive relief requested in light of his previous arrest for
the ordinance violation, which gives credence to his concern that
subsequent arrests may follow if he engages in the same conduct.  See
Steffel v. Thompson, 415 U.S. 452, 459 & 463 n.12 (1974).

> The freedom of speech . . . guaranteed by
> the Constitution embraces at the least the
> liberty to discuss publicly and truthfully all
> matters of public concern without previous
> restraint or fear of subsequent punishment. . .
> . Freedom of discussion, if it would fulfill its

> historic function in this nation, must embrace
> all issues about which information is needed or
> appropriate to enable the members of society to
> cope with the exigencies of their period.

Thornhill v. Alabama, 310 U.S. 88, 101-02 (1940).

"Freedom of expression has particular significance with respect to government because it is here that the state has a special incentive to repress opposition and often wields a more effective power of suppression." First Nat'l Bank of Boston v. Bellotti, 435 U.S. 765, 777 n.11 (1978) (internal quotation marks and citation omitted). "[S]peech concerning public affairs is more than self-expression; it is the essence of self-government. And self-government suffers when those in power suppress competing views on public issues from diverse and antagonistic sources." Id. at 777 n.12 (internal quotation marks and citations omitted).

It cannot be disputed that the speech at issue here, questioning the federal government's role in the aftermath of September 11, is protected by the First Amendment. The question thus turns to whether the City's demonstrating ordinance unlawfully restricts such speech.

A.    Time, Place and Manner Restrictions

The Supreme Court has frequently declared that the very core of the First Amendment is "that government 'has no power to restrict expression because of its message, its ideas, its subject matter, or its content.'" Consolidated Edison Co. of N.Y., Inc. v. Pub. Serv. Comm'n of N.Y., 447 U.S. 530, 537 (1980) (quoting Police

- 6 -

Dep't of Chicago v. Mosley, 408 U.S. 92, 95 (1972)) (citing Cox v. State of La., 379 U.S. 536, 580-81 (1965)).  The Court explained that "[i]f the marketplace of ideas is to remain free and open, governments must not be allowed to choose 'which issues are worth discussing or debating . . . .'"  Id. at 537-38 (quoting Mosley, 408 U.S. at 96).

"Public places" historically associated with the free exercise of expressive activities, such as streets, sidewalks, and parks, are considered, without more, to be "public forums."  United States v. Grace, 461 U.S. 171, 176-77 (1983).  "Sidewalks, of course, are among those areas of public property that traditionally have been held open to the public for expressive activities and are clearly within those areas of public property that may be considered, generally without further inquiry, to be public forum property."  Id. at 179.  Contrary to the City's assertion here, the elevated nature of the sidewalk constituting the Park Avenue overpass, which permits pedestrians to safely cross from one side of the interstate highway to the other, does not transform this otherwise public sidewalk into a non-public forum.  Other than its elevated nature, there is nothing to indicate to the public that this sidewalk is in any way different from other public sidewalks in the city.  Cf. id. at 183.

Although the government may restrict or regulate expressive activity in a public forum, a distinction must be drawn between content-based and content-neutral regulations.  To justify a content-*based* restriction, the government must show that the

regulation or restriction is necessary to serve a compelling state interest and that it is narrowly drawn to achieve that end. By contrast, restrictions on speech that are viewpoint *neutral* and subject-matter neutral may permissibly regulate the time, place and manner of expression if they are content-neutral, are narrowly tailored to serve a significant government interest, and leave open ample alternative channels of communication. <u>Grace</u>, 461 U.S. at 176-77; <u>Perry Educ. Ass'n v. Perry Local Educators' Ass'n</u>, 460 U.S. 37, 45 (1983).

To determine if a restriction is content-neutral, "[t]he principal inquiry . . . , in speech cases generally and in time, place, or manner cases in particular, is whether the government has adopted a regulation of speech because of disagreement with the message it conveys." <u>Ward v. Rock Against Racism</u>, 491 U.S. 781, 791 (1989). A regulation is deemed content-neutral if it serves purposes unrelated to the content of speech, regardless of whether it incidentally affects certain speakers or messages and not others. <u>Id.</u> That is, government regulation of speech is properly regarded as content-neutral if it is "*justified* without reference to the content of the regulated speech." <u>Id.</u> (citation and internal quotation marks omitted) (emphasis in <u>Ward</u>).

Section § 17.16.270 of the City Code restricts speech on any street or abutting premises to the extent such speech results in "a gathering of persons or stopping of vehicles as to impede either pedestrians or vehicular traffic." This ordinance was promulgated

and is enforced as a matter of public safety.  Such promulgation and enforcement bear no relation to the content of any given speech, and is applicable only when pedestrian or vehicular traffic is impeded as a result of the speech.  "It is a traditional exercise of the States' 'police powers to protect the health and safety of their citizens.'" Hill v. Colorado, 530 U.S. 703, 715 (2000) (quoting Medtronic, Inc. v. Lohr, 518 U.S. 470, 475 (1996)).  "Government authorities have the duty and responsibility to keep their streets open and available for movement."  Cox, 379 U.S. at 554-55.  Section 17.16.270 of the City Code serves public safety purposes unrelated to the content of speech and is justified without reference to the content of speech.  The ordinance is therefore content-neutral.  Ward, 491 U.S. at 791.

Plaintiff contends that because the safety concern purportedly addressed by the ordinance, that is, impeding traffic flow, is actually caused by the conduct of third parties in their reaction to a speaker's speech, the ordinance cannot be considered content-neutral inasmuch as it amounts to a "heckler's veto" by punishing the speaker for actions taken by third parties. Plaintiff's argument is misplaced.  A heckler's veto is an impermissible content-based restriction on speech where the speech is prohibited due to an anticipated disorderly or violent reaction of the audience.  See Brown v. State of La., 383 U.S. 131, 133 n.1 (1966).  "The 'heckler's veto' involves situations in which the government attempts to ban protected speech because it might provoke a violent response."  Roe v. Crawford, 514 F.3d 789, 796 n.3 (8th

- 9 -

Cir. 2008) (citing <u>Cohen v. California</u>, 403 U.S. 15, 23 (1971)).  "In such situations, 'the mere possibility of a violent reaction to [protected] speech is simply not a constitutional basis on which to restrict [the] right to speak.'"  <u>Id.</u> (quoting <u>Lewis v. Wilson</u>, 253 F.3d 1077, 1081 (8th Cir. 2001)); <u>see also</u> <u>Forsyth County, Ga. v. Nationalist Movement</u>, 505 U.S. 123, 134-35 (1992) (invalidating ordinance allowing administrator to adjust parade permit fees based on anticipated hostility to speech and concomitant higher cost of security).

There is no heckler's veto here.  The ordinance regulates speech to the effect it causes a gathering of persons or stopping of vehicles as to impede either pedestrians or vehicular traffic.  The purpose of the ordinance is not to suppress a message but rather to prevent certain undesirable secondary effects, that is, restricted traffic flow and hazards to pedestrians.  The speech need not be offensive, disagreeable or incite a reaction from its listeners. Indeed, it matters not to the enforcement of this ordinance whether traffic is impeded by disorder, violence, cheering, jeering, or otherwise, but only that traffic be impeded.  A municipality has the right to regulate the use of city streets "to assure the safety and convenience of the people in their use and the concomitant right of the people of free speech and assembly." <u>Cox</u>, 379 U.S. at 554.

As "repeatedly explained" by the Supreme Court, "government regulation of expressive activity is content neutral if it is justified without reference to the content of regulated speech."

Hill, 530 U.S. at 719-20 (internal citations, quotation marks and footnotes omitted). As set out above, § 17.16.270 of the City Code is justified without reference to the content of any given speech. The ordinance is therefore content-neutral.

Section 17.16.270 is also narrowly tailored to serve a significant government interest. The requirement of narrow tailoring is satisfied so long as the regulation promotes a substantial government interest that would be achieved less effectively absent the regulation. Ward, 491 U.S. at 799. "So long as the means chosen are not *substantially* broader than necessary to achieve the government's interest, . . . the regulation will not be invalid simply because a court concludes that the government's interest could be adequately served by some less-speech-restrictive alternative." Id. at 800 (emphasis added).

Here, the City has an interest in protecting the safety of its pedestrians and the free flow of vehicular traffic. See Hill, 530 U.S. at 715; Coates v. Cincinnati, 402 U.S. 611, 614 (1971) (cities are "free to prevent people from blocking sidewalks [or] obstructing traffic . . . [and] can do so through the enactment and enforcement of ordinances directed with reasonable specificity toward the conduct to be prohibited"); Cox, 379 U.S. at 554-55 (government authorities have the "duty and responsibility to keep their streets open and available for movement"). See also Frye v. Kansas City Mo. Police Dep't, 375 F.3d 785, 792 (8th Cir. 2004) (city has "'substantial interest in requiring drivers to devote greater

attention to driving conditions and the road signs'") (quoting <u>Foti</u>
<u>v. City of Menlo Park</u>, 146 F.3d 629, 641 (9th Cir. 1998)). By
regulating only that conduct which occurs in places such that public
safety is disrupted and thereby threatened, it cannot be said that
the ordinance burdens substantially more speech than is necessary to
further the City's interests. <u>See</u> <u>Association of Cmty. Orgs. for</u>
<u>Reform Now (ACORN) v. St. Louis County</u>, 930 F.2d 591, 596 (8th Cir.
1991). Although plaintiff argues that to demonstrate narrow
tailoring, the City must show a "real nexus" between the challenged
ordinance and the significant government interest sought to be
served, that is, traffic and pedestrian safety, the Eighth Circuit
has specifically articulated that "[t]he government need not wait for
accidents to justify safety regulations." <u>Id.</u>

    Finally, the ordinance at issue here leaves open ample
alternative channels of communication. Plaintiff avers that the
ordinance prevents him from holding a sign near a street. A plain
reading of the ordinance belies this assertion. Section 17.16.270
prohibits only that communication which results in such "a gathering
of persons or stopping of vehicles as to impede either pedestrians or
vehicular traffic." The ordinance does not ban the channel of
communication proposed by plaintiff, nor restrict alternative
channels of communication. At his deposition, plaintiff testified
himself that he and his group have conveyed their message by
displaying signs and distributing leaflets, televising public service
announcements on a local public access cable channel, through the

- 12 -

internet, and by demonstrating near sporting events in the City of St. Louis. Plaintiff also testified that he has demonstrated on overpasses in the City, including the overpass in question here, without incident. The ordinance does not restrict such means of communication absent "a gathering of persons or stopping of vehicles as to impede either pedestrians or vehicular traffic." Where a speaker's conduct results in such "a gathering of persons or stopping of vehicles as to impede either pedestrians or vehicular traffic," however, it is within the City's province to regulate the speaker's channel of communication as a matter of public safety. Although the First Amendment protects protestors' rights to advocate their cause, the First Amendment does not give them a right to dictate the manner in which they convey their message within their chosen avenue. Frye, 375 F.3d at 792.

"Nothing in the Constitution requires the Government freely to grant access to all who wish to exercise their right to free speech on every type of Government property without regard to the nature of the property or to the disruption that might be caused by the speaker's activities." Cornelius v. NAACP Legal Defense & Educ. Fund, Inc., 473 U.S. 788, 799-800 (1985). Although the ability of the government to limit expressive activity in a traditional public forum is "sharply circumscribed," Perry Educ. Ass'n, 460 U.S. at 45, the government remains free to take action to maintain public order. Cox, 379 U.S. at 554. Because the ordinance here is content-neutral, is narrowly tailored to serve a significant government interest and

- 13 -

leaves open ample alternative channels of communication, the City's time, manner and place restrictions as set out in § 17.16.270 are constitutionally permissible.

B.    Overbreadth

Plaintiff also argues that the ordinance is overbroad.  The overbreadth doctrine prohibits the government from banning unprotected speech if a substantial amount of protected speech is prohibited or chilled in the process.  Broadrick v. Oklahoma, 413 U.S. 601, 612 (1973).  A judicial declaration that a law is unconstitutionally overbroad "is, manifestly, strong medicine."  Id. at 613.  As such, "[t]he overbreadth of a statute must not only be real, but substantial as well, judged in relation to the statute's plainly legitimate sweep."  Id. at 615.

Section 17.16.270 is not overbroad.  As discussed above, the ordinance is applicable to speech only when pedestrian or vehicular traffic is impeded as a result of the speech, thereby jeopardizing public safety.  Although plaintiff argues that talented singers and persons advertising their employers' wares along a roadside are at heightened risk for criminal penalties under the ordinance since they are likely to cause a gathering of persons, plaintiff puts forth no argument demonstrating why such hypothetical singers and/or employees would not otherwise be properly subject to the ordinance which promotes public safety by preventing impediments to pedestrian and traffic flow, regardless of the nature of their speech or activity.

C.   Vagueness

The "void-for-vagueness doctrine requires that a penal statute define the criminal offense with sufficient definiteness that ordinary people can understand what conduct is prohibited and in a manner that does not encourage arbitrary and discriminatory enforcement." Kolender v. Lawson, 461 U.S. 352, 357 (1983). A statute will be held void for vagueness if the conduct forbidden by it is so unclearly defined that persons "of common intelligence must necessarily guess at its meaning and differ as to its application." Connally v. General Constr. Co., 269 U.S. 385, 391 (1926); see also United States v. Carpenter, 422 F.3d 738, 746 (8th Cir. 2005).

> [B]ecause we assume that man is free to steer between lawful and unlawful conduct, we insist that laws give the person of ordinary intelligence a reasonable opportunity to know what is prohibited, so that he may act accordingly.  Vague laws may trap the innocent by not providing fair warning.  Second, if arbitrary and discriminatory enforcement is to be prevented, laws must provide explicit standards for those who apply them.  A vague law impermissibly delegates basic policy matters to policemen, judges, and juries for resolution on an ad hoc and subjective basis, with the attendant dangers of arbitrary and discriminatory application.  Third, but related, where a vague statute abut(s) upon sensitive areas of basic First Amendment freedoms, it operates to inhibit the exercise of (those) freedoms.  Uncertain meanings inevitably lead citizens to steer far wider of the unlawful zone
>
> . . . than if the boundaries of the forbidden areas were clearly marked.

Grayned v. City of Rockford, 408 U.S. 104, 108-09 (1972) (footnotes omitted) (internal quotation marks omitted).

Plaintiff argues that the ordinance here is unconstitutionally vague inasmuch as it does not define what constitutes an "abutting premises" to a street; does not give sufficient guidance as to when and where it will be applied inasmuch as the conduct which triggers its enforcement, that is, the response of third parties, is beyond the control of the speaker; and lends itself to arbitrary enforcement as demonstrated by the officers' conduct in this case, that is, being called upon to determine whether plaintiff's sign might impede traffic. For the following reasons, plaintiff's claim fails.

1. *Abutting Premises*

Section 17.16.270 imposes restrictions on activities which take place on any street or "abutting premises." Plaintiff argues that the word "abutting" may be meant to include property directly next to or touching a street, but that in that instance a pedestrian overpass such as the one at issue in this cause would not fall within the parameters of the ordinance.

The Constitution does not require the legislature to incorporate Webster's Dictionary into each statute in order to insulate it from vagueness challenges. See Dennis v. Poppel, 222 F.3d 1245, 1260 (10th Cir. 2000). "[C]ondemned to the use of words, we can never expect mathematical certainty from our language." Grayned, 408 U.S. at 110. "Perfect clarity and precise guidance have never been required, even of regulations that restrict expressive

activity." <u>Ward</u>, 491 U.S. at 794. Nevertheless, the term "abut" or "abutting" has a plain and commonly understood meaning which does not lend itself to impermissible guesswork.[4]

"What renders a statute vague is not the possibility that it will sometimes be difficult to determine whether the incriminating fact it establishes has been proved; but rather the indeterminacy of precisely what that fact is." <u>United States v. Williams</u>, 553 U.S. 285, 306 (2008). Thus, the Supreme Court has struck down statutes that tied criminal culpability to "wholly subjective judgments without statutory definitions, narrowing context, or settled legal meanings." <u>Id.</u> With respect to the ordinance here, whether or not a premises "abuts" a street is an objective and factual determination and not one left open to subjective interpretation. There is no indeterminacy here. As such, the term "abutting premises" as used in § 17.16.270 does not render the ordinance vague. The determination of whether challenged activity occurred in such a defined location is a clear question of fact. Although it may be difficult in envisioned circumstances to determine whether this fact has been proved, such difficulties are addressed, "not by the doctrine of vagueness, but by the requirement of proof beyond a reasonable doubt." <u>Id.</u> The fact that questions may arise regarding the ordinance's applicability to

---

[4]Black's Law Dictionary defines "abut" as "[t]o join at a border or boundary; to share a common boundary with." The Merriam-Webster Dictionary defines "abut" as "to touch along a border or with a projecting part; to terminate at a point of contact." Finally, the American Heritage Dictionary defines "abut" as "[t]o touch at one end or side of something; lie adjacent."

certain conduct, including the conduct providing the impetus for the instant lawsuit, does not automatically lead to the conclusion that the ordinance is void for vagueness.  See Thornburn v. Austin, 231 F.3d 1114, 1121 (8th Cir. 2000).

2.  *Lack of Notice*

Plaintiff also argues that the ordinance fails to provide reasonable notice as to whether a speaker's conduct is criminal before a violation occurs inasmuch as the conduct which triggers its enforcement, that is, the response of third parties, is beyond the control of the speaker.

The ordinance here provides fair warning of the conduct that is prohibited.  A person of ordinary intelligence can observe when pedestrian or vehicular traffic is impeded due to the gathering of persons or the stopping of vehicles on account of his or her activity, and can conclude based on such observation that s/he may be subject to prosecution under the City's ordinance for engaging in activity causing such impediment.  Whether and to what extent it was the speaker's conduct that in fact caused the impediment "is addressed, not by the doctrine of vagueness, but by the requirement of proof beyond a reasonable doubt."  Williams, 553 U.S. at 306.  It is a mistake to believe that "the mere fact that close cases can be envisioned renders a statute vague. . . . Close cases can be imagined under virtually any statute."  Id. at 305-06.

3.  *Arbitrary Enforcement*

Nor does the ordinance lend itself to arbitrary

enforcement.  Section 17.16.270 clearly states that a violation occurs where, as a result of the conduct, "there is such a gathering of persons or stopping of vehicles as to impede either pedestrians or vehicular traffic."  Contrary to plaintiff's assertion, the ordinance does not apply to conduct which "might" impede traffic.  Cf. Leonardson v. City of East Lansing, 896 F.2d 190, 198 (6th Cir. 1990) (ordinance addressing conduct that "*may* cause persons to collect on the public streets, sidewalks, or other areas of the City" invites arbitrary and discriminatory enforcement).  As in Grayned, the ordinance here "does not permit people to 'stand on a public sidewalk . . . only at the whim of any police officer.'"  408 U.S. at 114 (quoting Shuttlesworth v. Birmingham, 382 U.S. at 90).  Instead, there must be a demonstrated impediment to pedestrian or vehicular traffic for the ordinance to apply.  Questionable application of the ordinance on one occasion does not render the ordinance vague for arbitrary enforcement.  Thornburn, 231 F.3d at 1121.

Because there is no real risk of discriminatory enforcement and because the ordinance makes clear what conduct it prohibits, it is not unconstitutionally vague.  Thornburn, 231 F.3d at 1121.

D.  Non-Pleaded Claim(s)

As noted at the outset, plaintiff seeks no personal relief for any alleged violation of his First Amendment rights by the conduct of the City of St. Louis, its officers or employees.  No such claim(s) are before the Court for resolution.  For the Court to decide questions on matters not presented would be to render an

advisory opinion, which the Court cannot do. <u>Layton v. State of S.D.</u>, 918 F.2d 739, 745 (8th Cir. 1990). <u>See</u> <u>Flast v. Cohen</u>, 392 U.S. 83, 96 (1968) ("[I]t is quite clear that 'the oldest and most consistent thread in the federal law of justiciability is that the federal courts will not give advisory opinions.'") (quoting C. Wright, <u>Federal Courts</u> 34 (1963)); <u>see also</u>, <u>e.g.</u>, <u>Heartland Acad. Cmty. Church v. Waddle</u>, 335 F.3d 684, 691 (8th Cir. 2003) (the role of the Court is to decide the issues brought before it and not to offer an advisory opinion on what scenario should or should not exist for a party to obtain additional relief). Because the question of whether plaintiff's First Amendment right(s) were violated is not before the Court for resolution, the Court declines to give an advisory opinion thereon. <u>Cf.</u> <u>Copper v. City of Fargo</u>, 905 F. Supp. 680 (D.N.D. 1994) (ordinance constitutional on its face, but plaintiffs sought and were entitled to personal relief for violation of First Amendment rights inasmuch as plaintiffs' conduct did not fall within prohibition of ordinance).

E.   <u>Conclusion</u>

    For all of the foregoing reasons, plaintiff's request that § 17.16.270 of the St. Louis City Revised Code be declared unconstitutional and that the City of St. Louis, Missouri, be enjoined from enforcing its terms should be denied.


    Accordingly,

    **IT IS HEREBY ORDERED** that defendant City of St. Louis,

Missouri's Motion for Summary Judgment (Doc. No. 18) is granted.

**IT IS FURTHER ORDERED** that plaintiff Donald E. Stahl's Motion for Summary Judgment (Doc. No. 21) is denied.

Judgment shall be entered accordingly.


_Frederick R. Buckles_
UNITED STATES MAGISTRATE JUDGE



Dated this  _17th_  day of November, 2010.